# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| SUNTRUST MORTGAGE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:11CV464 |
| | ) | |
| | ) | |
| POWDER HOUSE MORTGAGE | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

George R.A. Doumar (VA Bar No. 26490)
James R. Harpold (VA Bar No. 74967)
DOUMAR MARTIN, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA 22046
Tel (703) 243-3737
Fax (703) 524-7610
gdoumar@doumarmartin.com


Attorneys for Defendant Powder
House Mortgage Company, Inc.

March 13, 2012

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT…………….……………………........................1

SUMMARY OF MATTER...……………………………………….…........................2

STATEMENT OF UNDISPUTED MATERIAL FACTS……………………………5

ARGUMENT…………………………………………………………………………8

I.    THE FACTS SUPPORT SUMMARY JUDGMENT UNDER THE
      APPLICABLE STANDARD OF REVIEW.......................................................8

II.   ESTOPPEL BARS ANY CLAIMED BREACH OF CONTRACT
      BASED ON SUNTRUST'S OWN KNOWLEDGE AT THE
      TIME OF UNDERWRITING...........................................................................9

      A.    SunTrust Knew of All Issues with the Horton Loan in 2006 that Later
            Led SunTrust in 2009 to Deem the Appraisal Unacceptable, but
            SunTrust Approved the Loan in 2006 Anyway…………………………9

      B.    Courts Have Held that Estoppel Precludes Parties from Invoking
            Breach of Contract in Analogous Circumstances……………………11

            1.    A Party Leading Another Party in Good Faith to take some
                  Action Cannot Change Position………………………………...11

            2.    Failure to Disclose Material Facts Leads to Estoppel……….11

            3.    SunTrust's Knowledge of Valuation Differences, Comp
                  Problems, and Square Footage Discrepancies During
                  Underwriting are All Contrary to Its Efforts to Blame Powder
                  House for These Issues in 2010…………………..……………13

      C.    Estoppel Applies more Forcefully Here Than in Applicable Precedents
            Because Powder House Did Not Know the Problems with the
            Appraisal………….....………………………………………………14

III.  WAIVER APPLIES AND BARS SUNTRUST FROM SEEKING
      INDEMNIFICATION AGAINST POWDER HOUSE……………………..15

      A.    Waiver of a Contractual Provision is Inferred from Conduct……….16

1

|       | B.    | Silence Over Material Issues is Grounds For Waiver Here............17 |
|-------|-------|------------------------------------------------------------------------|

IV.    EFFECTIVELY, SUNTRUST CANNOT SHOW A BREACH AND/OR
       CAUSATION THAT PROXIMATELY CAUSED DAMAGES.............18

V.     FILED SEPARATELY UNDER SEAL

VI.    THE FULL CREDIT BID DOCTRINE BARS SUNTRUST'S CLAIMS...19

       A.    Fannie Mae Was Made Whole On the Horton Loan at Foreclosure...19

       B.    Any Right to Monies Owed on the Loan to Fannie
             Mae Was Extinguished When Fannie Mae Bid in
             Full on the Debt at Foreclosure..............................................................20

VII.   SUNTRUST'S COMPLAINT LIMITS ITS CLAIMS, AS TO
       LIABILITY AND DAMAGES ………………………………………………..22

       A.    SunTrust in Counts I and II Seeks Only Damages for
             Amounts Paid to Fannie Mae……………………………………...22

       B.    SunTrust Claims It Would Not Have Made the Loan If It Had Known
             of Defects in the Appraisal in 2006, But SunTrust Knew of Such
             Defects in 2006 and Made the Loan Anyway.............................23

       C.    The Correspondent Loan Purchase Agreement, As To Indemnification
             and Warranties, Does Not Reference the Appraisal.....................23

       D.    SunTrust Has a Strong Incentive To Indemnify Fannie Mae, As Their
             Business Relationship Continues…………..…………………………...24

CONCLUSION………………………………………………………………..24

EXHIBITS INDEX

EXHIBITS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| SUNTRUST MORTGAGE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:11CV464 |
| | ) | |
| POWDER HOUSE MORTGAGE | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Powder House Mortgage Company, Inc. ("Powder House"), by and through

counsel, hereby submits this Memorandum in Support of its Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

The doctrines of estoppel and waiver both require dismissal. SunTrust is estopped from

making the claims herein, and has waived its right to claim damages, based on its own actions

and knowledge. SunTrust seeks indemnification in this lawsuit based on purported defects

relating to the size and location of comparable properties chosen for the origination appraisal, the

gross living area of the subject house, and the overvaluation of the subject property. SunTrust

was aware of all these issues at the time SunTrust underwrote the loan in November 2006 and

then funded the loan. SunTrust did not disclose these issues to Powder House and approved the

loan anyway.

In March 2009, when Fannie Mae raised issues with SunTrust with the same appraisal

1

that SunTrust had approved in 2006, SunTrust reversed itself and agreed that the appraisal was "unacceptable" based on the same factors that SunTrust apparently found acceptable in 2006. SunTrust paid Fannie Mae's claimed losses without question.

Fannie Mae also apparently made a full credit bid for this property in foreclosure. Under Virginia law, this should have precluded Fannie Mae from having any cognizable damages. SunTrust thus had no obligation to pay Fannie Mae, and cannot seek recovery for such payments from Powder House.

SunTrust also cannot show the key allegation of its Complaint, namely that had it known of the appraisal issues at the time SunTrust made the loan, that SunTrust would not have made the loan. Complaint, ¶ 19. A party is held to its Complaint.

Under Virginia law, a party cannot "justifiably rely" on information and statements that it knows to be faulty. SunTrust knew about the defects in the appraisal.

## SUMMARY OF MATTER

SunTrust Mortgage, Inc. ("SunTrust") has initiated a flurry of litigation against small mortgage brokers and other loan originators. SunTrust purchased these loans during the residential real estate boom, and no longer does business with these third party originators, including Powder House. See Tina Kadas Deposition, Mar. 7, 2012 ("Kadas Dep."), Exhibit 1("Ex.") at 22, 23. SunTrust alleges that it had to repurchase or indemnify third-party purchasers of loans, such as Fannie Mae in this case, because the loans were somehow defective. See, e.g., Complaint, ¶¶11-13. In the fourth quarter of 2011 alone, SunTrust received demands to repurchase or pay investors, primarily Fannie Mae, for approximately $636 million in mortgages. David Benoit, *Update: SunTrust Mortgage Problems Persist: Bank Joins AG Talks*, The Wall Street Journal, January 20, 2012.

SunTrust and Powder House did business for approximately fourteen years. Declaration of Michael DeKoster, attached as Ex. 2 ("DeKoster Dec.") at ¶2. As of November 2009, for example, SunTrust was still servicing over 600 loans originated by Powder House. See SunTrust "Scorecard" attached as Ex. 3. In around 2000, the parties signed a Correspondent Loan Purchase Agreement, attached hereto as Ex. 4. Powder House was a "table funded" lender, that is, Powder House collected documents but SunTrust underwrote and funded each loan at closing. See Deposition of James G. Carter, Feb. 21, 2012 ("Carter Dep."), Ex. 5 at 46. Powder House put together loan packages; SunTrust reviewed and underwrote each package to assess risk and then decide whether to fund the loans.

Powder House originated and SunTrust underwrote and funded a loan through SunTrust's "EZ Options" program on a property at 337 Summer Street in Rehoboth in Massachusetts, in the amount of $412,000, with a second loan of $77,250. See Deposition of Thomas Switzer, Feb. 23, 2012 ("Switzer Dep."), Ex. 6 at 22, 23. The borrower was Barry Horton, and the loans are sometimes referred to herein as the Horton loan or loans. This was a "no ratio" loan, part of a program that relied on credit scores and did not verify a borrower's income; such program no longer exists. Switzer Dep. 24, at Ex. 6.

When SunTrust underwrote the loan in November 2006, SunTrust quickly became aware of certain deficiencies in the appraisal for the loan relating to comparable properties used in the appraisal ("comps"), gross living area square footage for the property, and overall valuation, but approved the loan anyway. SunTrust received the loan package at issue on or about November 7, 2006, but suspended the loan process on about November 16, 2006, based on issues with the appraisal. See SunTrust Pended Loan Notification, at Ex. 7. SunTrust's underwriter was dissatisfied with the "comps" in the appraisal, and requested two additional "comps similar in

3

acreage, design and appeal." See Pended Loan Notification with handwritten notes at Ex. 8;

Deposition of Sandra DeLagrange, March 7, 2012 ("DeLagrange Dep."), Ex. 9 at 21; Appraisal

of Benjamin Appraisal Associates, LLC, at Ex. 10. Although the appraisal in the loan package

estimated a property value of $515,000, SunTrust's underwriter investigated and pulled

documentation on November 16, 2006 (not disclosed to Powder House) indicating that the actual

value was in a range of $328,000 to $388,000 (a 25%-36% variance from $515,000). See Value

Finder Printout dated 11/16/2006, attached as Ex. 11. This documentation further indicated that

the gross living area on the loan appraisal was incorrect. The valuation SunTrust retrieved

showed a gross living area of 1,301 square feet, not 1,794 square feet as listed on the original

appraisal. See Home Value Finder Printout, at Ex. 11. As the underwriting party, SunTrust

assessed the appraisal's characteristics. See DeLagrange Dep. 61, at Ex. 9. Yet SunTrust never

alerted Powder House to the issues it found during its review, other than to request two

additional "comps." See Declaration of Robert Wagoner, Ex. 12 ("Wagoner Dec."), at ¶5.

Had Powder House known the appraisal was inaccurate as to valuation or did not meet

specified guidelines, its loan officer would have raised the issues with his superiors. See

Declaration of Robert Wagoner, Ex. 12. Powder House would have had the chance to take some

action, such as suggesting adjustments, recommending a different loan, or forwarding a denial

notice. DeKoster Dec., Ex. 2, at ¶5. SunTrust never disclosed this information to Powder

House.

SunTrust received the two additional comps on or about November 28, 2006. See Email

written by Robert Wagner to Correspondence Appraisals at Ex. 13. SunTrust approved the loan,

and the loan closed on or about January 17, 2007.

In 2008 Mr. Horton filed for bankruptcy and defaulted on the loans. Fannie Mae

foreclosed on the property. At the auction, Fannie Mae made a "full credit bid," that is, bid the amount of its note. See Fannie Mae Internal Notes Log, at Ex. 15, showing a bid of $445,117 on a loan balance of $412,000. In March 2009 Fannie Mae sought indemnification for its losses from SunTrust. See Letter Notice from Fannie Mae to SunTrust, at Ex. 16; Loan file setting out claims at Ex. 17 (also notes payments to SunTrust as part of damages).

Fannie Mae raised issues as to the appraisal's comps, gross living area, and valuation. Id. SunTrust concluded in June 2009 that the appraisal was unacceptable because the comps were larger than the subject property, the comps were in a different neighborhood, the gross living area varied between the appraisal and the available records, and there was a 39% variance from $515,000 in an automated property valuation. See June 17, 2009 Email written by John Murdy, at Ex. 18. These items were the same ones SunTrust had uncovered during the underwriting process.

All the issues that SunTrust's Mr. Murdy found that made the appraisal "unacceptable" in June 2009 were apparent during underwriting in November 2006, but SunTrust approved the loan anyway. SunTrust sought indemnification from Powder House in a letter dated October 17, 2010. Ex. 19.

Under Count I, SunTrust alleges breaches of two warranties, at 17.3.2 (as to compliance with SunTrust's Manual, among other items) and 17.11 of the Correspondent Loan Purchase Agreement, and in Count II, SunTrust alleges a breach of the indemnity provision, which references the warranty provisions, at Section 22.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Powder House originated a loan for a residential borrower at 337 Summer Street, Rehoboth, Massachusetts, 02769. See Uniform Residential Loan Application, at Ex. 20.

2. Powder House put together a package of materials including a loan application with the borrower, Barry Horton. See Uniform Residential Loan Application, at Ex. 20.

3. The SunTrust product for the loan at issue was a "no ratio" loan, meaning there was no income verification. Switzer Dep.), Ex.6 at 22-24. There was an "80%" loan for $412,000 and a "15%" second loan for $77,007.91. Id. at 6 and Complaint, ¶18. Under this program no mortgage insurance was required. Kadas Dep., Ex. 1 at 34.

4. The loan package included an appraisal by Benjamin Appraisal Services, LLC dated November 5, 2006 valuing subject property at $515,000. See Benjamin Appraisal Services, LLC, attached as Ex. 10.

5. The appraisal included a comparison of the subject property with three comparable properties. Id.

6. The subject property was 0.82 acres. All three comparable properties were 6.6 acres to 7.6 acres and more than two miles away. Id., at 3, Ex. 21.

7. The appraisal reflected a suburban location. Id.

8. The appraisal included a gross living area of 1,794 square feet. Id.

9. SunTrust was responsible for underwriting the loan. DeLagrange Dep., Ex. 9, at 13,14.

10. SunTrust's underwriter "pended" the loan, meaning she suspended the loan, based on issues with the appraisal, on about November 16, 2006. See Pended Loan Notification at Ex. 8.

11. SunTrust's underwriter did her own research and pulled automated valuation models showing details for the subject property and neighboring properties on or about November 16, 2006. Home Value Finder Printout, at Ex. 11; Home Value Finder Printout for

6

neighboring properties at Ex. 21.

12.     The model SunTrust retrieved for the subject property on November 16, 2006 showed that the property had 1,301 square feet of gross living area and had a value of $328,000 to $388,000, a 25%-36% variance from $515,000. See Home Value Finder Printout at Ex. 11. SunTrust never shared this information with Powder House. See Declaration of Robert Wagoner, at Ex. 12. See DeLagrange Dep., at 28, 29, Ex. 9.

13.     SunTrust's underwriter on November 16, 2006 requested two additional appraisals for properties with "similar acreage, design and appeal" as the subject property "from subject's immediate neighborhood." See Pended Loan Notification, at Ex. 8.

14.     On November 28, 2006, the appraiser sent back two additional appraisals, through Powder House, one of 1.56 acres and one of 19.6 acres, both of which were also 3.5 and 5.8 miles away from the subject property. Excerpts from updated appraisal attached at Ex. 22.

15.     SunTrust's underwriter approved the loan on November 27 subject to receipt of the additional comps. SunTrust funded the loan on or about January 17, 2007.

16.     SunTrust resold the loan to Fannie Mae, but continued to service the loan.

17.     Fannie Mae's notes indicate that it foreclosed on the property on or about August 13, 2008 for $445,167.77, over $30,000 more than the principal value of the loan. Ex. 15.

18.     On March 13, 2009, Fannie Mae sought indemnification for its losses based on issues with the appraisal from November 2006, including the comps, the gross living area, and the valuation. Ex. 16.

19.     On June 27, 2009, SunTrust concluded the appraisal was unacceptable based on the acreage of all the comps being larger, the location of the comps in terms of distance from the subject property being more than two miles, the variance in the gross living area between the

appraisal and the amount listed in public records of 1,301 square feet, and a valuation model showing a $316,000 value, or 39% variance from $515,000. See Email written by John Murdy to Jeannette James, at Ex. 18. SunTrust paid Fannie Mae Fannie Mae's claimed damages.

20.     On October 27, 2010, SunTrust wrote to Powder House seeking indemnification. Ex. 19.

21.     SunTrust's Agreement with Fannie Mae required SunTrust to indemnify Fannie Mae for knowingly selling a loan that is not an acceptable investment. See Mortgage Selling and Servicing Guide, filed separately under seal pursuant to confidentiality order.

22.     Two SunTrust witnesses testified that the gross living area on the initial appraisal was obviously incorrect based on the pictures that came with the appraisal. The witnesses could see that the first and second floor were different sizes, while the appraiser's sketch showed a first and second floor of the same size. Switzer Dep. 48,49 at Ex. 6. Deposition of John Murdy, March 7, 2012 ("Murdy Dep."), Ex. 14 at 29, 30. Mr. Switzer testified that even after obtaining two additional comps at SunTrust's request, none of the comps considered were appropriate. See Switzer Dep. 86,87, at Ex. 6. All of the comps were much larger than the subject property. Switzer Dep. 86, 87.

23.     SunTrust's appraisal evaluator from 2009, Mr. Murdy, testified that any variance of more than 15% from the appraised value in an automated valuation raised a red flag. Murdy Dep.47, 48 at Ex. 14.

## ARGUMENT

### I.     THE FACTS SUPPORT SUMMARY JUDGMENT UNDER THE APPLICABLE STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 106 S. Ct. 2548 (1986). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 US 242, 106 S. Ct. 2505 (1986). The nonmoving party must produce more than a scintilla of evidence to overcome a summary judgment motion. Id. at 257. Summary judgment will be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case…" Celotex at 322.

A plaintiff is limited by its allegations in its Complaint. Aviles v. Equifax Information Services, LLC et al, 521 F. Supp. 2d 519 (E.D. Va. 2007). The linchpin of Plaintiff's Complaint here is that had SunTrust known of the infirmities with the loan appraisal at the time it made the loan, SunTrust would not have made the loan. Complaint, ¶19. SunTrust cannot prove this key allegation. Also, Counts I and II also seek indemnification and damages for breach of warranty only for the payments to Fannie Mae, not for any claimed losses on the second loan. Complaint ¶¶24, 30.

The related doctrines of estoppel and waiver bar SunTrust's claim.

## II.   ESTOPPEL BARS ANY CLAIMED BREACH OF CONTRACT BASED ON SUNTRUST'S OWN KNOWLEDGE AT THE TIME OF UNDERWRITING

### A.   SunTrust Knew of All Issues with the Horton Loan in 2006 That Later Led SunTrust In 2009 to Deem The Appraisal Unacceptable, But SunTrust Approved the Loan in 2006 Anyway

Even assuming there is a contractual breach, estoppel precludes a party from asserting rights it otherwise would have had when his own conduct renders assertion of those rights contrary to equity. American Bankers Insurance Group v. Long et al, 453 F .3d 623 (4th Cir.

2006)(applying estoppel to prevent party form invoking contract but denying arbitration clause). Estoppel arises in particular where a person by his statement, act, or silence induces another to rely detrimentally, resulting in damages that would have otherwise been avoided. State courts have sometimes held that the aggrieved party must demonstrate (1) representation or conduct; (2) reliance by the aggrieved party; (3) a change of position in good faith; and (4) detriment to the aggrieved party for equitable estoppel to apply. Nargi v. Camac Corp., 820 F. Supp. 253, 256-57 (W.D. Va. 1992).

In the Nargi case, the Court applied estoppel to prevent a defendant from limiting a case to breach of contract, after Mr. Nargi claimed he had accepted a new position in a new location based on the opposing party's promise to provide him with long-term employment. Id. Nargi sold his house in reliance on the corporation's promise. Nargi, 820 F. Supp at 256. The court declined to limit the case to a letter from the corporation's president, which did not mention a time period for employment.[1]

Regardless of the original appraisal valuation of $515,000 by Benjamin Appraisal Services, LLC, SunTrust was aware during the underwriting process that the Horton property was worth $328,000 to $388,000, based on the valuation model reviewed by SunTrust at the time it made the loan. Ex . 11. That valuation is 25%-36% different from the $515,000 appraisal, a percentage far beyond the 15% SunTrust uses in evaluating appraisals. Murdy Dep. 61, 62 at Ex. 14. Even the two additional comparable properties were bad, as SunTrust's own witness confirmed that the appraisal contained five "non-comparable" comparables, based on acreage

---

[1] See also Cigna Corp. v. Amara, 131 S.Ct. 1866, 18(2011)(remanding case to district court to reform pension plan contract when equity required it)("Equity courts would reform contracts where 'fraudulent, suppression(s), omission(s), or insertion(s),' 1 Story § 154, at 149, 'material[ly] ... affect[ed] the 'substance' of the contract.) ...").

10

size and distance from the subject property. Switzer Dep. 72, Ex. 6. The documents reviewed by SunTrust's underwriter confirmed that the subject property had significantly less square footage than listed on the appraisal, and that the origination appraisal used the "non-comparable" comparables, and that the valuation was much less than in the appraisal. Ex.11, 21. The underwriter knew the comparables in the appraisal were problematic. DeLagrange Dep. at 22, Ex. 9. Yet despite this knowledge, SunTrust approved and funded the Horton loans.

SunTrust's witness noted in testimony that the loan, including appraisal, actually technically satisfied SunTrust's internal guidelines at the time. See Switzer Dep. 69, Ex. 6. Appraisals are as Mr. Switzer noted, an art form. Id. at 72. SunTrust, having approved the loan with full information, cannot years later assert indemnification provisions against Powder House.

**B.     Courts Have Held That Estoppel Precludes Parties from Invoking Breach of Contract in Analogous Circumstances**

**1.     A Party Leading Another Party in Good Faith to Take Some Action Cannot Change Position**

The Fourth Circuit recently applied estoppel in a purchase contract in which Baltimore County and other counties claimed that a petroleum trader had breached its contract, preventing Baltimore County from terminating a contract for breach. Petroleum Traders Corp. v. Baltimore County, Md., et al., 413 Fed. Appx. 588, 594-96 (4th Cir. 2011). The court ruled that Baltimore County had authorized its purchasing agent to negotiate on its behalf and the trader had reasonably relied on its previous contractual dealings to believe the fixed-price contract was in place. Id. The same reasoning prevents SunTrust from invoking indemnification provisions here.

**2.     Failure to Disclose Material Facts Leads to Estoppel**

Silence that leads a reasonable man to act in good faith also leads to estoppel. See Bruce, Inc. v. Gemini Asset Managers, et. al, 35 Va. Cir. 372, 378 (1995)("A person is estopped from

denying the consequences of his conduct where that conduct has been such to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made."). See Am. Hardware Mut. Ins. Co. v. BIM, Inc., 885 F.2d 132, 141 (4th Cir. 1989)("Even mere 'silence' may, at least in some circumstances, constitute a binding waiver – or may estop the aggrieved party from later asserting a material breach").

In Virginia First Savings & Loan Association v. Wells, 224 Va. 691, 299 S.E. 2d 370 (1983), a widow sued the savings and loan for failure to purchase a credit life insurance policy on her husband that would have covered the balance on the couple's home loan upon his death. As part of the loan agreement, Virginia First agreed to submit Mr. Well's application for life insurance, and collected premiums on it for three years, but never actually submitted the application. When the husband died, the savings and loan defended alleged that the husband would not have been eligible for life insurance anyway, and argued that fact absolved it of its obligation to submit the application. The Court differed, holding, "by its conduct, it concealed knowledge of Mrs. Wells' financial hazard while she was in a position to guard against it by taking other action…Virginia First having created this ambiguity, will not be permitted to rely on it as a defense to the damages arising from its breach of contract." Virginia First Savings & Loan Association, 224 Va. at 695, 299 S.E. at 372-73.

Like the widow in Virginia First Savings & Loan, Powder House lacked material information that would have altered its decision to sell the Horton loans. The savings and loan was not allowed to profit from its failure to purchase insurance on its loan. SunTrust should likewise be barred from profiting on a loan it purchased despite its knowledge of deficiencies in the origination appraisal. Powder House would certainly have changed its position had it known its appraisal overvalued the property to the tune of hundreds of thousands of dollars.

12

**3.    SunTrust's Knowledge of Valuation Differences, Comp Problems, and Square Footage Discrepancies During Underwriting Are All Contrary to Its Efforts to Blame Powder House for These Issues in 2010**

Estoppel is appropriate where a party tries to assert affirmative protections of a contract where it has actual knowledge of contrary facts, giving it an unfair advantage. The undisputed facts show that SunTrust underwrote the loan, had issues of concern about the appraisal, pulled a valuation model with a far lower value and different square footage, requested two additional comps but did not share its findings as to valuation with Powder House, approved the loan, and that Powder House relied upon the underwriter's review and acceptance of the appraisal documents *before the closing of the Horton loans* in order to close. See DeKoster Dec., at 4, Ex. 2.

The full review and request for additional comparable properties led Powder House to believe that the Horton loans met the underwriting guidelines. See DeKoster Dec., Ex. 2, at 3. See DeLagrange Dep., Ex. 9, at 68, 69. SunTrust's witness testified that the appraisal did meet applicable guidelines. Switzer Dep., Ex. 6, at 69. Powder House relied upon SunTrust's approval of the loan and specifically the appraisal in underwriting. DeKoster Dec., at 3. If Powder House had learned of valuation issues, Powder House would have addressed the loan at the time, either changing the loan, or working out some arrangement with SunTrust or another lender. See DeKoster Dec. 5, at Ex. 2.

Then SunTrust paid Fannie Mae its claimed damages in 2009 without then demanding indemnification from Powder House, which thus could not mount a defense to Fannie Mae even in 2009. That action by SunTrust makes sense because SunTrust underwrote the loan and is responsible for its decisions. Plus, SunTrust had an ongoing relationship with Fannie Mae. SunTrust cannot then come back over a year later and claim indemnification.

13

SunTrust's position here is akin to that of the French prefect of police closing down Rick's Café in the movie Casablanca based on his "shocking" discovery of gambling at the premises, while at the same time he thanks the staff for providing his gambling winnings. SunTrust knew of all the alleged problems about which it now complains, but underwrote and funded the loan anyway.

**C.    Estoppel Applies More Forcefully Here Than in Applicable Precedents Because Powder House Did Not Know the Problems With the Appraisal**

In an analogous, insurance context, courts estopped insurance companies from asserting certain provisions in their contracts with the insured, and were held to waive their rights to deny claims. Georgia Home Insurance Co. v. Goode & Co., 95 Va. 751, 30 S.E. 366 (1898), and Va. Fire & Marine Insurance, Co. v. Goode & Co., 95 Va. 762, 30 S.E. 370 (1898).  In Georgia Home, Goode & Co. sought insurance for its business, and indicated that its property was unencumbered. 95 Va. at 755, 30 S.E. at 368.  But the insurance company was aware that a marginal note for an amount of $390 remained on the property, and despite this knowledge, indicated to the insured that no liens existed.  Id.  After a fire burned out the premises, the insurance company tried to deny coverage based on the misrepresentation that there was no lien on the property.  Because the insurance company knew of such lien at the time of insurance, the Court held that the insurance company could not deny coverage.  95 Va. at 758, 30 S.E. at 369.

Similarly, SunTrust cannot enforce contractual rights to Powder Houses detriment, when SunTrust itself knew of claimed deficiencies in the appraisal at the time of underwriting.

In Va. Fire & Marine, 95 Va. 762, 30 S.E. 370, supra, the insurance company was estopped from claiming that a failure to have a party sleeping at the premises voided the policy, where the insured claimed someone was always in residence, yet both the insured and the

14

insurance agent knew that not to be true. 95 Va. at 770-71, 30 S.E. at 371. Because the insurance company apparently knew an otherwise "material" fact to be untrue, it could not enforce rights it would otherwise have against the insured.

SunTrust cannot claim Powder House breached a warranty or representation when SunTrust was aware of such purported breach at the time of underwriting. Powder House is even more innocent than the defendants in the insurance cases above as Powder House did not know the appraisal was "bad." In Georgia Home and Va. Fire, the insured and the insurers were both aware of the true state of affairs – that there was a $390 lien on property and that a property was not occupied around the clock – yet insurance contracts were issued with warrants reflecting no lien and a watchman. SunTrust knew of the deficiencies yet agreed to purchase the Horton loan anyway, exactly like the insurance companies.

Even had SunTrust acted without the intent to profit by its deception, Virginia law places loss on those whose conduct caused an injury. In Thomasson v. Stewart, 168 Va. 247, 190 S.E. 309 (1937), the Court held "that when one of two innocent persons, each of whom is guiltless of an intentional moral wrong, must suffer a loss, it should be borne by that one of them who by his conduct has rendered the injury possible." Thomasson 168 Va. 247, 255-56, 190 S.E. 309, 312. This principle requires SunTrust to bear the loss here.

## III.    WAIVER APPLIES AND BARS SUNTRUST FROM SEEKING INDEMNIFICATION AGAINST POWDER HOUSE

Similar factual circumstances to those here have resulted in application of a waiver doctrine in the face of a potential breach to stop a party from enforcing its contractual rights. SunTrust's ultimate decision to purchase the Horton Loans represents an affirmative waiver of the indemnification provisions in the Correspondent Loan Purchase Agreement.

15

**A.** **Waiver of a Contractual Provision Is Inferred From Conduct**

The essential elements of waiver are: (a) knowledge of the facts basic to the exercise of the right, and (b) intent to relinquish that right. Stockbridge v. Gemini, 269 Va. 609, 621, 611 S.E.2d 600, 606 (2005)(citing Va. Polytechnic Inst. & State Univ. v. Interactive Return Service, 267 Va. 642, 651-52, 595 S.E.2d 1, 6 (2004)). See also Reid v. Boyle, 259 Va. 356, 370, 527 S.E.2d 137, 145(2000)("We have also held that contracting parties, through a course of dealing, may evince a mutual intent to modify the terms of their contract... The parties simply ignored the terms of the written agreement"). Waiver of a contractual provision may be inferred from conduct. Va. Polytechnic Inst. & State Univ. v. Interactive Return Service, 267 Va. 642, 651, 595 S.E.2d 1, 6 (2004).

In Virginia Tech, the Court concluded that the university had relinquished its rights to prompt payment under a contract by continuing to work with a defendant despite non-payment, to receive a working prototype from the defendant. The Supreme Court found that through a "course of dealing," that the university had abandoned its contractual rights. SunTrust, like Virginia Tech, chose to accept the Horton loan despite its apparent defects. Instead of presenting the issues with the appraisal to Powder House, SunTrust asked for two additional comparables, received them, and funded the loan.

Under Section 6.4.1 of the Correspondent Loan Purchase Agreement, SunTrust approved the loan and effectively confirmed that the loan met its own underwriting guidelines for conventional mortgages. Correspondent Loan Purchase Agreement, §6.4.1, Ex. 4. The same facts that support estoppel also require application of the waiver doctrine. Ms. DeLagrange suspended the loan after her first review of the appraisal. DeLagrange Dep. 47, Ex. 9. Ms. DeLagrange stated that if she were reviewing the property today, she would have asked even

16

more questions because the mortgage crisis had caused banks to tighten up their lending practices. DeLagrange Dep. 47 at Ex. 9. SunTrust made a financial decision to fund the loan anyway. This decision to clear the pended loan caused Powder House to believe that SunTrust had waived any right to claim there had been a breach with respect to the appraisal. Otherwise, SunTrust need not have an underwriter review the loan in the first place, and would not have approved the loan.

SunTrust never advised anyone at Powder House that it considered the appraisal opinion in violation of its underwriting guidelines. Instead, SunTrust accepted the appraisal opinion after receiving two more comparable properties that, according to its own witness in deposition, still did not satisfy the underwriter's stated requirements in terms of size and proximity to the subject property. Switzer Dep. at 71-72, Ex. 6.

SunTrust was a sophisticated purchaser when it bought the loans from Powder House Mortgage. When it chose to continue the purchase with full awareness of the appraisal issue, SunTrust relinquished its right to seek repurchase of that loan.

**B.** **Silence Over Material Issues Is Grounds for Waiver Here**

Under Virginia law and common law, a party that keeps quiet about a possible contract breach relinquishes its rights in respect of such breach. In Stockbridge v. Gemini, 269 Va. 609, 621, 611 S.E.2d 600, 606 (2005), the Virginia Supreme Court found that when no deadline is provided for the issuance of a notice, the court would interpret those provisions to provide a "reasonable time after the operative facts become known to the board." Section 37 of the Correspondent Loan Purchase Agreement requires "each party shall promptly notify the other in writing of any such delay or failure in performance, the expected duration thereof, and its anticipated effect …and (b) shall use its best efforts to remedy such delay." (emphasis added)

17

Ex. 4. SunTrust knew of the purported breach for which it now claims indemnification at the time of the loan in 2006. SunTrust did not "notify" Powder House until late in 2010.

## IV. EFFFECTIVELY, SUNTRUST CANNOT SHOW A BREACH AND/OR CAUSATION THAT PROXIMATELY CAUSED DAMAGES

Courts have dismissed claims such as those here, finding under analogous circumstances that there is no breach of a specific representation that proximately caused damages to Plaintiff. In Lasalle Bank v. Nomura Asset Cap. Corp., 424 F.3rd 195, 211-12(2d. Cir. 2005), the Second Circuit rejected a loan purchaser's argument that the seller's origination procedures were not "proper and prudent" in light of industry standards and accordingly, constituted a breach of its warranty. Id. at 212. The trial court rejected Lasalle's claim that Nomura had breached its warranty because it had not reviewed a final appraisal until the night before a loan closed. Lasalle Bank v. Nomura Asset Cap. Corp., 2004 U.S. Dist. LEXIS 18599(S.D.N.Y. 2004). The court noted that the Defendants had followed rating agency standards and guidelines and that Plaintiff had received a copy of an appraisal two months before the closing of the trust. Id. at 30.

Similarly, in Wells Fargo Bank Minn. and ORIX Cap. Markets, LLC v. Wachovia Bank, et al., 2005 U.S. Dist. LEXIS 9676, 5-6 (N.D. Tex.), affm'd 2006 U.S. Dist. LEXIS 18861 (5th Cir. 2006), the court dismissed a case against the loan seller, Wachovia, in which a subsequent purchaser[2], ORIX Capital Markets, argued that Wachovia breached its loan purchase agreement when it destroyed underlying mortgage documents to which ORIX was entitled. Id. at 16. Wachovia argued that there was no breach of warranty since the previous purchasers had all conducted due diligence and had the opportunity to request additional information on the loans two years earlier. Id. at 11-12. ORIX's predecessor, Criimi Mae, had conducted due diligence and closed on the loans in May 1998. Id. at 5. ORIX conducted due diligence itself prior to

---

[2] At this point, the loans had been securitized and placed into a trust. ORIX conducted due diligence itself prior to purchasing certificates in a trust.

purchasing certificates in a trust. Id. at 10. As the Court noted: "At the time of its purchase in 2000, ORIX had the documents it needed to appraise and re-underwrite the loans in the Trust and to determine a value for the certificates (emphasis added)." The court dismissed the case argued by Wells Fargo and ORIX because the purchaser had not suffered damages caused by such breach. Id. at 16. Wells Fargo Minn. and ORIX Cap. Markets., LLC v. Wachovia, 196 Fed. Appx. 246, 249 (5th Cir. 2006). See also Wells Fargo Bank v. LaSalle Bank Nat. Assn., 643 F.Supp.2d 1014, 1032-33 (W.D. Ohio 2009)(finding that mortgage seller was entitled to summary judgment in breach of contract case because borrower misrepresentations did not constitute warranties of the mortgage seller).

SunTrust had an opportunity to review the appraisal in 2006 and did vet the appraisal at that time. Since SunTrust was aware of the appraisal deficiency in 2006 *before it made the purchase* and still went forward with the purchase, any subsequent loss was due to SunTrust's own actions.

V.    **SUNTRUST'S INDEMNIFICATION OF FANNIE MAE EITHER WAS BASED ON SUNTRUST'S OWN KNOWLEDGE OR NOT REQUIRED, BUT IN EITHER CASE NO BREACH OF CONTRACT BY POWDER HOUSE CAUSED SUNTRUST'S CLAIMED LOSS**

**THIS SECTION FILED SEPARATELY UNDER SEAL DUE TO PRESENCE OF DOCUMENT CLAIMED AS CONFIDENTIAL**

VI.   **THE FULL CREDIT BID DOCTRINE BARS SUNTRUST'S CLAIMS**

A.    **Fannie Mae Was Made Whole On the Horton Loan at Foreclosure**

SunTrust sold the primary Horton loan for $412,000 loan to Fannie Mae. Fannie Mae foreclosed on the property, and at the foreclosure sale apparently bid $445,167.77 in or around August of 2008. See Ex. 15. Fannie Mae accordingly did not suffer a legally cognizable loss for which SunTrust had to pay any money.

19

Fannie Mae's outstanding indebtedness was extinguished at the time of the foreclosure sale. Yet, SunTrust paid Fannie Mae without questioning or further investigating whether such a duty was actually owed to Fannie Mae. By indemnifying Fannie Mae without questioning Fannie Mae's claimed damages, SunTrust is not entitled to recoup damages it could have avoided.

**B.**     **Any Right to Monies Owed on the Loan to Fannie Mae Was Extinguished When Fannie Mae Bid in Full on the Debt at Foreclosure**

In Provident Mut. Life Ins. Co. v. Khasgiwala, the Fourth Circuit held that once a lender has foreclosed and purchased property at public foreclosure sale for the full amount of a loan, that loan is extinguished and the lender is no longer entitled to any further funds, regardless of whether a lender believes it overbid for the property at foreclosure. 1997 U.S. App. LEXIS 7162 (4th Cir. Apr. 16, 1997). In Provident the lender financed the borrower for the purchase of a shopping mall, which the borrower then rented out to various tenants. One of the borrower's tenants abandoned the property and paid borrower $555,683 to terminate its lease. The borrower then transferred $555,000 to its sole shareholder, officer, and director.

Thereafter, the borrower stopped paying the lender and lender foreclosed on the property with $892,674 outstanding on the loan. The lender purchased the property at a public foreclosure sale for $938,084.73, after which the loan and all associated fees were completely paid. The borrower obviously had received substantial funds from his tenant, and the lender argued in vain that it grossly overbid for the property at the foreclosure and that the appraised value of the property should determine how much the borrower actually owed. The Fourth Circuit rejected the lender's argument, finding that the lender was paid in full when it foreclosed and purchased the property for the full amount of the loan.

Virginia courts have also found that once a lender has foreclosed and made a credit bid

on the full amount of the loans, the lender is not entitled to more. In <u>Martin v. Comtex, Inc.</u> the court granted the mortgagor summary judgment against a mortgagee, who sought to place an equitable lien on insurance proceeds made available after the mortgagee had already foreclosed and purchased on credit the underlying property for the entire amount of the mortgagor's debt. 23 Va. Cir. 459, 459 (Va. Cir. Ct. 1991). In <u>Martin</u> the mortgagor took out two deeds of trust totaling $50,000 payable to the mortgagee and obtained fire insurance on the premises, as was required under the deeds. <u>Id.</u> Subsequently, a fire destroyed buildings on the property, the mortgagee foreclosed on the property, repurchasing same on credit at an auction sale for $59,000, covering both deeds and interest due. <u>Id.</u> After the auction sale, the insurance company made available $40,000 to the mortgagee and mortgagor, and the mortgagee sought to put a lien on the proceeds. <u>Id.</u> at 459-60.

The mortgagee argued that the mortgagor's debt was not paid when the mortgagor bought the property at auction, because the bid did not establish the property's value. <u>Id.</u> The mortgagor argued that the mortgagee was not entitled to the insurance proceeds, because the mortgagee extinguished any debt owed to it by reason of the mortgagor bidding on credit the full amount of the mortgagor's debt at auction. <u>Id.</u> at 461. The court agreed with the mortgagor and held that the mortgagee's acts of foreclosing and bidding on the full amount of the debt discharged the entire debt and mortgagee had no further entitlement to money, including the insurance proceeds, regardless of the true value of the property. <u>Id.</u> at 462-63.

Like the lenders in <u>Provident</u> and <u>Martin</u>, when Fannie Mae, as the noteholder of the Horton loan foreclosed on the $412,000 loan, and bid an amount of $445,167.77, which covered the original loan amount and any additional costs and fees, Fannie Mae no longer was entitled to any further money. That Fannie Mae later sold the property at a loss is irrelevant. Any debt

21

owed Fannie Mae was extinguished when it foreclosed and purchased the property for the full amount. As the Fourth Circuit and the Virginia Circuit Court of the City of Richmond respectively held in <u>Provident</u> and <u>Martin</u>, it is irrelevant whether the lender believes that it overbid; when the lender bids the full amount owed on the loans, its right to collect on the loans is extinguished.

SunTrust should have disputed Fannie Mae's claims, as any money owed to Fannie Mae was extinguished when it bid on the full amount of debt at foreclosure. SunTrust failed to investigate, or even question, the matter further. Thereafter, SunTrust paid Fannie Mae $247,410.27 and now claims damages in the same against Powder House. SunTrust could have avoided the entire amount and mitigated its damages had it actually performed reasonable inquiry and challenged Fannie Mae claims as it should have.

## VII. SUNTRUST'S COMPLAINT LIMITS ITS CLAIMS, AS TO LIABILITY AND DAMAGES

### A. SunTrust in Counts I and II Seeks Only Damages for Amounts Paid to Fannie Mae

SunTrust affirmatively limits itself to "damages to SunTrust for money paid to secondary investors for the Horton 2544 loans," and that Powder House's breach "necessitated the indemnification of secondary investors as well as the repurchase from secondary investors of the Horton 2544 loans."(SunTrust in fact never repurchased the Horton loan). Complaint at ¶¶ 24 and 30. SunTrust states that it indemnified Fannie Mae in the amount of $247,410.27. Complaint at ¶ 18. Plaintiff notes that it retained a second lien on the Horton Property that was never sold to secondary purchasers. <u>Id</u>. Although SunTrust discusses that second lien, SunTrust does not claim a breach of warranty or indemnification as to this second lien in Counts I and II; thus no judgment can be entered as to that loan. <u>See</u> <u>Aviles v. Equifax Information Services, LLC et al</u>, 521 F. Supp. 2d 519 (E.D. Va. 2007); <u>Hook v. Turnbull</u>, 10 Va. 85, 1806 Va. Lexis

20, 6 Call 85 (1806). Thus, this Court must dismiss claims for recovery on the second deed of trust as a matter of summary judgment.

**B.     SunTrust Claims It Would Not Have Made the Loan If It Had Known of Defects in the Appraisal in 2006, But SunTrust Knew of Such Defects in 2006 and Made the Loan Anyway**

The linchpin of Plaintiff's Complaint here is that had SunTrust known of the infirmities with the loan appraisal at the time it made the loan, SunTrust would not have made the loan. Complaint, ¶19. In this case, however, SunTrust did know of such infirmities and made the loan anyway. SunTrust factually cannot prove what it alleged.

**C.     The Correspondent Loan Purchase Agreement, As To Indemnification and Warranties, Does Not Reference the Appraisal**

A misrepresentation is a statement of fact. An appraisal, as SunTrust's own witness admitted in this matter, is a matter of opinion. Switzer Dep. 58, at Ex. 6. SunTrust alleges breaches of two representations, at 17.3.2 and 17.11 of the Correspondent Loan Purchase Agreement, in Count I, and a breach of the indemnity as Section 22 of the Correspondent Loan Purchase Agreement, at Count II. Neither of these provisions addresses appraisals. Nothing in the warranty or indemnity sections addresses lack of knowledge.

Section 20, however, governing repurchase obligations, requires a seller to repurchase a loan in the case not only of breaches of representations and warranties, Section 20.1.1, but also where there is any misleading information, "regardless of whether Seller had or should have had knowledge of the same," including any information in any "appraisal." Section 20.1.3. SunTrust knew how to specify that knowledge by a Seller was irrelevant, and knew how to specify in particular when appraisals were at issue, because SunTrust did so in the repurchase sections. SunTrust specified both matters in the case of repurchases. But neither in the representations and warranties section nor in the indemnity section does SunTrust specify

23

appraisals or lack of knowledge by the seller.

## D. SunTrust Has a Strong Incentive to Indemnify Fannie Mae, As Their Business Relationship Continues

SunTrust continues to do business with Fannie Mae. Murdy Dep. 19 at Ex. 14; Kadas

Dep. 21 at Ex. 1. Kadas believes that SunTrust has indemnified Fannie for more than one

thousand loans to date. Kadas Dep. 20, at Ex. 1. In fact, the check containing SunTrust's

indemnification payment for the Horton loan contained indemnification payments for 32 other

loans. Kadas Dep. 17, at Ex. 1. Kadas went on to admit that SunTrust has not sued any

correspondent that they continue to do business with. Kadas Dep. 22-23 at Ex. 1. Switzer

testified that SunTrust cannot argue with Fannie Mae's decision to request indemnification for

appraisals that were inadequate because "you can't argue with the investor." Switzer Dep. 86, at

Ex. 6.

SunTrust either failed to challenge an indemnification demand from Fannie Mae even

though it had valid defenses, in order to preserve its relationship, or indemnified Fannie Mae

based on its own knowledge.

## CONCLUSION

Powder House has no obligation to indemnify SunTrust. SunTrust was fully aware of the

alleged deficiencies in the origination appraisal in 2006. Instead of raising any issue then, it

resold the loan to Fannie Mae. Then, in 2009, it indemnified Fannie Mae, based on the same

issues that arose in 2006 during underwriting. SunTrust never raised anyone of several valid

defenses to Fannie Mae's requests. SunTrust seeks indemnification from Powder House. There

was no breach by Powder House, and even if there was, SunTrust's liability to Fannie Mae is

independent of said breach. SunTrust's own knowledge and silence triggered any obligation to

Fannie Mae. This case must be dismissed with prejudice.

24

Dated: March 13, 2012                    Respectfully submitted,

   /s/George R.A. Doumar
George R.A. Doumar (VA Bar No. 26490)
Elaine M. Darroch (VA Bar No. 37697)
James R. Harpold (VA Bar No. 74967)
DOUMAR MARTIN, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA 22046
Tel (703) 243-3737
Fax (703) 524-7610
gdoumar@doumarmartin.com

Attorneys for Defendant Powder
House Mortgage Company, Inc.

## Certificate of Service

I hereby certify that on this 13th day of March 2012, I sent a copy of the foregoing via ECF to the following:

L. Scott Bruggemann, Esq.
Wolfe & Wyman, LLP
901 E. Byrd Street, Suite 1105
Richmond, Virginia 23219

*Attorneys for Plaintiff SunTrust Mortgage, Inc.*

/s/ George R. A. Doumar
George R.A. Doumar (#26490)
James R. Harpold (#74967)

25

Doumar Martin, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA 22201
Tel: (703) 243-3737
Fax: (703) 524-7610
gdoumar@doumarmartin.com

ATTORNEYS FOR DEFENDANTS
Powder House Mortgage Company, Inc.